(No. 32696.—

LYMAN D. WORKS, Admr., *et al.,* Appellants, *vs.* EDWARD McNEIL, *et al.,* Appellees.

*Opinion filed September 24, 1953—Rehearing denied Nov. 16, 1953.*

48

P. C. WALTERS, of Albion, TOWNSEND & TOWNSEND, of Mt. Carmel, and BRANIGAN & BRANIGAN, of Franklin, Indiana, for appellants.

PETER BAMBERTH, of Albion, and KERN & PEARCE, of Carmi, for appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

On November 21, 1951, Benjamin C. Hartley filed a complaint in the circuit court of Edwards County against Edward McNeil and Goldie Bell McNeil seeking thereby to set aside a trust agreement dated October 31, 1951, wherein Hartley had conveyed to the McNeils all of his real and personal property in return for their promise to provide and care for him during the rest of his life.

Hartley died shortly after the suit was started and his heirs and administrator were substituted as parties plaintiff. The chancellor heard the evidence in the cause and at its conclusion entered a decree dismissing the complaint for want of equity. A freehold being involved, the heirs and administrator have prosecuted a direct appeal to this court, contending chiefly that the trust agreement was procured by undue influence and in violation of a fiduciary relationship between the parties; that Hartley was not possessed of the mental capacity to make such a trust agreement; and that the trust agreement must fail as being an attempted testamentary disposition, improperly executed.

From the record we find that Benjamin C. Hartley was a bachelor, seventy-three years of age, when the contested agreement was executed, who had, for many years, lived alone in his small house in the community of Browns, in Edwards County. He had been crippled by infantile paralysis at the age of seven and walked only with the aid of a cane. He did his own housekeeping and tended to his own business affairs but often required the assistance of his neighbors and, as he grew older, depended more and more on his friends and neighbors to take care of his business and personal needs. About six years before his death he became acquainted with Edward and Goldie Bell McNeil, the appellees, who rented a garden plot from him and rendered him small services and favors from time to time. In the spring of 1951, Hartley suffered a severe attack of influenza and though his health improved in the summer, he again became seriously ill in the fall. On October 11, 1951, a physician was called to Hartley's home and found him bedfast. After some difficulty in overcoming penurious tendencies which Hartley developed in his old age, the doctor persuaded him to enter a hospital where he was subsequently treated for prostatic enlargement, hardening of the arteries and prostatic infection. Just before going to the hospital, Hartley delivered to McNeil, for safekeeping,

certain bonds having a face value of $17,275, and a package containing some currency, all of which Hartley had kept concealed in his house. The record does not disclose that Hartley accumulated his property through any particular business acumen but shows that he received much of it as the *cestui* of a trust created by a sister.

During Hartley's confinement in the hospital the McNeils visited him almost every day. On or about October 21, 1951, Hartley is purported to have told McNeil to see an attorney about the preparation of a trust agreement and, at the same time, gave McNeil a letter to the sick man's bank directing it to inform the bearer as to the full amount of his checking account. The record does not conclusively show who initiated the proposed transaction or what discussion, if any, took place with regard to it. McNeil, however, did engage an attorney the same day and the latter prepared the instrument here under attack. By its terms Hartley conveyed to the McNeils certain described real and personal property, constituting the bulk of his estate, and they agreed to maintain and care for him for the rest of his life. McNeil then took the proposed agreement to the hospital and left it with Hartley for examination. On October 31, 1951, McNeil took a notary public to the hospital and Hartley signed three copies of the instrument. Thereafter, at the notary's home, the McNeils signed the same paper. It appears that Hartley was not given a signed copy of the agreement, that he was not acquainted with the notary public or the attorney who prepared the instrument, and did not meet or confer with the latter at any time.

McNeil paid Hartley's hospital and medical expenses with money the latter had delivered to him and, on November 15, 1951, Hartley was moved to a nursing home where he died a week later. A day or two after he entered the nursing home his relatives became aware of the trust agreement, which had then been placed on record, and he was visited by a niece, the husband of a second relative,

and an attorney, with whom he was acquainted. At that time Hartley told his visitors he had sent word to the attorney and the county judge to get him out of the mess he was in with the McNeils. The complaint in this case was filed shortly thereafter and before Hartley's death.

It is not disputed that Hartley was physically ill and very feeble from the time he entered the hospital until the date of his death. The condition of his mind, however, is the subject of much controversy. His heirs produced fifteen witnesses, including friends, neighbors and hospital personnel, thirteen of whom testified in substance that Hartley was not of sound mind at the time; that his mind would frequently wander, and that he did not have sufficient mental capacity to transact business. On the other side, appellees produced eight witnesses to Hartley's condition, including the attending physician, nurse, a fellow patient, and the notary public. The physician gave as his opinion that Hartley was of sound mind from October 24 to November 15, 1951. One of the nurses testified that prior to a "sick spell" Hartley was in a normal mental condition but thereafter appeared to change. The fellow patient, who was discharged from the hospital on October 19, testified that prior to that date Hartley appeared to be of sound mind and capable of transacting business. The wife of the latter witness, who had frequent occasions to converse with Hartley, testified to the same effect. Each, however, admitted that during a subsequent visit on November 7, his mind appeared to have deteriorated. The notary testified that she "thought" Hartley knew the nature of the transaction at the time he signed the papers, but stated that he was frail, that his voice was weak and that he appeared to be very ill. She further testified that Hartley was confined to his bed and that when he signed the papers, McNeil held him in a sitting position.

Appellants contend, *inter alia,* that the evidence clearly shows a confidential or fiduciary relationship between Hart-

ley and appellees, and that the latter have failed to satisfy their burden of proving good faith and the absence of undue influence. We are of the opinion that such contention must prevail. The undisputed facts that Hartley entrusted McNeil with custody of his bonds and currency and authorized him to obtain information concerning the bank account; that McNeil made the financial arrangements with the hospital and nursing home; that Hartley was an elderly man of impaired and feeble health, whereas appellees were middle-aged persons of good health and alert minds, and that a close and continuous personal relationship existed between them, leave little doubt that Hartley reposed trust and confidence in McNeil. A fiduciary relation exists in all cases in which there is confidence reposed on one side and a resulting superiority and influence on the other. (*Staufenbiel* v. *Staufenbiel,* 388 Ill. 511; *Bremer* v. *Bremer,* 411 Ill. 454.) Where such a relationship exists at the time of a transaction whereby the dominant party appears to gain at the expense of the dependent party, the transaction is to be deemed presumptively fraudulent and will be set aside unless the one in whom the confidence and trust is reposed establishes its fairness by clear and convincing proof. (*Clark* v. *Clark,* 398 Ill. 592.) Important factors in determining whether a particular transaction is fair include a showing by the fiduciary: (1) that he made a free and frank disclosure of all the relevant information he had; (2) that the consideration was adequate; and, (3) that the principal had competent and independent advice before completing the transaction. *Krieg* v. *Felgner,* 400 Ill. 113; *Dombrow* v. *Dombrow,* 401 Ill. 324.

Appellees produced no evidence of preliminary negotiations or discussions and there is no clear proof that Hartley understood the nature of the transaction. In addition, there is no showing in the record that he had independent and competent advice either before or at the execu-

tion of the trust agreement. It was McNeil who selected and instructed the attorney who drafted the instrument and the latter neither knew nor made any effort to contact Hartley and did not accompany McNeil to the hospital. No one was present at the time of the signing except McNeil and the notary and there is a complete lack of proof that Hartley, despite his poor physical condition and questionable mental capacity, ever had the benefit of advice from an attorney or other competent person. To be noted, too, is the fact that McNeil took all of the copies of the instrument with him, thus giving Hartley or his confidants little opportunity to know or discuss the contents of the agreement. As a result of the transaction, the record shows that appellees profited by approximately $20,000 from the agreement so obtained. Considering all of the evidence, we think it manifest that the transaction was not at arms length but was, rather, a one-sided proposition in which Hartley, an old, sick and enfeebled man, did not have the benefit of independent or competent advice. That he was tractable and open to suggestion may be gathered from his almost instant repudiation of his dealings with appellees.

Appellees contend that they have proved that the consideration for the agreement was adequate and argue that the settlor's death, twenty-three days after they had agreed to care for him for life, does not affect the adequacy of the consideration or the validity of the trust agreement. In· *Thomas* v. *Whitney*, 186 Ill. 225, where the facts were much the same as in the present case, this court had this to say: (p. 234) "It certainly needs no argument to show that the conveyance of all complainant's real estate for support and maintenance during the remainder of his life, which, in view of his enfeebled health and old age, could be but a few years, was extravagantly unjust to himself." This observation has even greater application in this case, for the testimony given by all witnesses makes it apparent that Hartley was rapidly declining when the agreement was

signed. Such a conclusion is substantiated by the hospital records which show that the settlor had a spell which brought him dangerously close to death within two days after the agreement was entered into. Such circumstances render it dubious, but not conclusive, that the contemplated consideration was, or could have been, adequate, particularly in view of McNeil's knowledge of the settlor's condition.

From the entire record, and particularly from the portions which show that Hartley, though physically and mentally upset, did not have independent or competent advice, we conclude that appellees, as fiduciaries, have failed to establish by clear and convincing evidence that their transaction with Hartley was a fair one, fully understood and agreed upon. This being so, the presumption of fraud created by their relationship requires, in equity, that the transaction be set aside.

In view of our conclusion, it is unnecessary to discuss other contentions made by appellants. The decree of the circuit court of Edwards County is contrary to the manifest weight of the evidence and is therefore reversed and the cause remanded, with directions to enter a decree setting aside the trust agreement.

*Reversed and remanded, with directions.*